IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, and The STATE OF ILLINOIS, and The STATE OF OHIO, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.  3:13-cv-00616-DRH-SCW |
| GATEWAY ENERGY & COKE COMPANY, LLC, | ) ) ) | |
| and | ) ) | |
| HAVERHILL COKE COMPANY, LLC, | ) ) ) | |
| and | ) ) | |
| SUNCOKE ENERGY, INC., | ) ) | |
| Defendants. | ) ) ) | |

## **COMPLAINT**

The United States of America ("United States"), by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("U.S. EPA"); the State of Ohio ("Ohio"), by and through Mike DeWine, Attorney General of Ohio, at the written request of the Director of Environmental Protection; and the State of Illinois ("Illinois"), by and through Lisa Madigan, Attorney General of Illinois on her own motion and at the request of the Illinois Environmental Protection Agency ("Illinois EPA"), allege as follows:

## NATURE OF THE ACTION

1.      This civil action comprises claims brought by the United States, the State of Illinois, and the State of Ohio against three defendants – Gateway Energy & Coke Company, LLC ("GECC"); Haverhill Coke Company, LLC, formerly known as Haverhill North Coke Company, LLC ("HNCC"); and SunCoke Energy, Inc. ("SunCoke").

2.      The claims in this Complaint relate to two facilities – the "Gateway Facility" in Granite City, Illinois, owned and operated by GECC and SunCoke, and the "Haverhill Facility" in Franklin Furnace, Ohio, owned and operated by HNCC and SunCoke.  Both facilities are used by the Defendants to manufacture metallurgical coke.

3.      The United States asserts claims in this action under the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. § 7401 *et seq.*  The United States seeks injunctive relief and civil penalties against GECC, HNCC, and SunCoke, for violations of the CAA and its implementing regulations.

4.      The State of Illinois asserts claims in this action under the Illinois Environmental Protection Act ("Illinois Act"), 415 ILCS 5/1 *et seq.* (2010), and seeks injunctive relief and civil penalties against GECC and SunCoke for violations of the Illinois Act.

5.      The State of Ohio asserts claims in this action under Chapter 3745 of the Ohio Revised Code ("ORC"), and the rules adopted thereunder, and seeks injunctive relief and civil penalties against HNCC and SunCoke for violations of ORC Chapter 3704.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to Sections 113(b) and 304(c) of the Act, 42 U.S.C. §§ 7413(b) and 7604(c), and pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367.

- 2 -

7.      This Court has supplemental jurisdiction over the state law claims asserted by Illinois under the Illinois Act and its implementing regulations and the Ohio claims pursuant to Chapter 3704 of the ORC and the rules adopted thereunder.

8.      Venue is proper in this District pursuant to Sections 113(b) and 304(c) of the Act, 42 U.S.C. §§ 7413(b), 7604(c), and 28 U.S.C. §§ 1391(b), (c) and 1395(a), because Defendant GECC resides in this District, has its principal places of business in this District, and the violations at the Gateway Facility have occurred and are occurring in this District.

**THE PARTIES**

9.      Plaintiffs are the United States, on behalf of U.S. EPA; the State of Illinois, on behalf of Illinois EPA; and the State of Ohio, on behalf of Ohio EPA.

10.      Authority to bring this action for the United States is vested in the United States Department of Justice pursuant to 28 U.S.C. §§ 516 and 519 and Section 305 of the CAA, 42 U.S.C. § 7605.

11.      Authority to bring this action for the People of the State of Illinois is vested in the Illinois Attorney General.  The Illinois Attorney General is the chief legal officer of the State of Illinois having the powers and duties prescribed by the law, Ill. Const. Art. V, § 15.  Illinois EPA is an administrative agency of the State of Illinois, created by Section 4 of the Illinois Act, 415 ILCS 5/4 (2010), and charged, *inter alia*, with the duty of enforcing the Illinois Act.

12.      Authority to bring this action for the People of Ohio is vested in the Ohio Attorney General.  The Ohio Attorney General is the chief law officer for the State of Ohio and shall appear for the state in any court or tribunal in a cause in which the State of Ohio is a party, O.R.C. Ch. 109.02.  Pursuant to O.R.C. 3704.06, the Ohio Attorney General, upon the request of

- 3 -

the Director of Environmental Protection, shall bring an action against any person violating or threatening to violate Chapter 3704 of the ORC.

13.     Defendant SunCoke is a duly incorporated company in the State of Delaware that has its corporate headquarters in the State of Illinois, with a principal business address of 1011 Warrenville Road, Lisle, IL 60532.  SunCoke is an owner and operator of the Gateway Facility and the Haverhill Facility.

14.     Defendant HNCC is a limited liability company under the laws of the State of Delaware with its principal place of business in Ohio.  HNCC is an owner and operator of the Haverhill Facility along with SunCoke (together "the Haverhill Defendants") within the meaning of Section 112(a)(9) of the CAA, 42 U.S.C § 7412(a)(9), and its implementing regulations, and the Ohio Administrative Code ("OAC") at 3745-15-01(T).

15.     Defendant GECC is a limited liability company under the laws of the State of Delaware with its principal place of business in Illinois.  GECC is an owner and operator of the Gateway Facility along with SunCoke (together "the Gateway Defendants") within the meaning of Section 112(a)(9) of the CAA, 42 U.S.C § 7412(a)(9), and its implementing regulations, and the Illinois Act, codified at 35 Ill. Adm. Code § 201.102.

16.     SunCoke is the corporate parent of HNCC and GECC and, based upon reasonable investigation and the opportunity to take further discovery, exercises pervasive control over the Facilities and over HNCC and GECC and has participated in, controlled and/or directed the activities underlying the violations alleged in the Complaint.

## NOTICES

17.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), notice of the commencement of this action has been given to Illinois EPA and Ohio EPA.  Pursuant to Section

- 4 -

113(a) of the CAA, 42 U.S.C. § 7413(a), U.S. EPA notified the Defendants and the State of Ohio

of the violations of the Ohio State Implementation Plan ("SIP") alleged in this Complaint more

than 30 days prior to its filing.  Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), U.S.

EPA notified the Defendants and the State of Illinois of the violations of the Illinois SIP alleged

in this Complaint more than 30 days prior to its filing.

## STATUTORY AND REGULATORY BACKGROUND

18.     The Clean Air Act establishes a regulatory scheme to protect and enhance the

quality of the nation's air resources so as to promote the public health and welfare and the

productive capacity of its population.  42 U.S.C. § 7401(b)(1).

19.     Section 108(a) of the CAA, 42 U.S.C. § 7408(a), requires the Administrator of

U.S. EPA to promulgate a list of each air pollutant, emissions of which may reasonably be

anticipated to endanger public health or welfare and the presence of which results from

numerous or diverse mobile or stationary sources.  Pursuant to Sections 108(a) and 112(b), U.S.

EPA has identified, *inter alia*, sulfur dioxide ($SO_2$), hydrochloric acid (HCl), nitrogen oxides

(NOx), particulate matter (PM) and lead as such pollutants.  *See* 42 U.S.C. §§ 7808, 7412(b) and

40 C.F.R. §§ 50.4, 50.5, 50.6, 50.7, 50.11 and 50.12.

20.     Section 109 of the CAA, 42 U.S.C. § 7409, requires the Administrator of U.S.

EPA to promulgate regulations establishing primary and secondary national ambient air quality

standards ("NAAQS") for those air pollutants for which air quality criteria have been issued

pursuant to Section 108 of the CAA, 42 U.S.C. § 7408.  The primary NAAQS are to be adequate

to protect the public health with an adequate margin of safety, and the secondary NAAQS are to

be adequate to protect the public welfare from any known or anticipated adverse effects

associated with the presence of the air pollutant in the ambient air.  Pursuant to Section 109 of

the CAA, U.S. EPA has promulgated primary and secondary NAAQS for sulfur dioxide, PM and lead.  40 C.F.R. §§ 50.4, 50.5, 50.6, 50.7 and 50.12.

21.     EPA revised the NAAQS for lead on November 12, 2008, 73 Fed. Reg. 67,052 (2008).  The final rule became effective on January 12, 2009.  EPA revised the primary NAAQS for lead in 2008 to provide increased protection for children and other at-risk populations against an array of adverse health effects, most notably including neurological effects in children, including neurocognitive and neurobehavioral effects. 73 Fed. Reg. 66,965 (November 12, 2008).

<u>State Implementation Plans</u>

22.     To achieve the objectives of the NAAQS and the CAA, Section 110 of the CAA, 42 U.S.C. § 7410, requires each State to adopt and submit to U.S. EPA for approval a plan that provides for the attainment and maintenance of the NAAQS in each air quality control region with each state.  This plan is known as a State Implementation Plan ("SIP").

23.     Pursuant to Section 110 of the CAA, 42 U.S.C. § 7410, the States of Illinois and Ohio have adopted and submitted to U.S. EPA for approval various rules for the attainment and maintenance of the NAAQS.  After such provisions are approved by U.S. EPA, pursuant to Section 110 of the Act, 42 U.S.C. § 7410, or promulgated by U.S. EPA pursuant to Section 110(c) of the Act, 42 U.S.C. § 7410(c), these provisions constitute the state's "applicable implementation plan" or SIP, within the meaning of Section 113(b) and 302(q) of the CAA, 42 U.S.C. §§ 7413(b) and 7602(q).

24.     On May 31, 1972, U.S. EPA approved the original Illinois SIP, which included the general permit requirements set forth at Illinois Pollution Control Board ("PCB") Rules 103(a)(1), 103(b)(1) and 103(b)(2).  37 Fed. Reg. 10842, 10862.  Due to the renumbering of the

Illinois PCB Rules, Rules 103(a), 103(b)(1) and 103(b)(2), as approved by EPA, are currently set forth at Illinois Administrative Code Title 25, at Sections 201.142, 201.143, and 201.144.

25.     On May 31, 1972, EPA approved the Ohio SIP general permit requirements, which are set forth at OAC Chapter 3745-31.  37 Fed. Reg. 10842, 10886.  On October 1, 1982, the Administrator of EPA approved OAC Rule 3745-15, General Provisions on Air Pollution Control, as part of the federally enforceable SIP for the State of Ohio.  47 Fed. Reg. 43377.  OAC Rule 3745-15 provides general provisions, including but not limited to malfunctions at stationary sources, scheduled maintenance, and reporting.

26.     Under Section 110(a)(2) of the Act, 42 U.S.C. § 7410(a)(2), each SIP must include a permit program to regulate the modification and construction of any stationary source of air pollution as necessary to assure that NAAQS are achieved.  Pursuant to Sections 113(a) and (b) of the Act, 42 U.S.C. §§ 7413(a) and (b), upon U.S. EPA approval, SIP requirements are federally enforceable under Section 113.  Under 40 C.F.R. § 52.23, any permit limitation or condition contained within a permit issued under a U.S. EPA-approved program that is incorporated in a SIP, is a requirement of the SIP, and is federally enforceable under Section 113 of the Act.

27.     The Ohio SIP, at OAC Rule 3745-15-06(A)(3), requires any source scheduling maintenance activities on air pollution equipment that requires the shutdown or bypassing of air pollution control equipment to request authorization to continue operating the source during the scheduled maintenance.  This request must be submitted in a written report at least two weeks prior to the planned shutdown of the air pollution control equipment.

28.     The Ohio SIP, at OAC Rule 3745-15-06(B), requires, in the event that any emission source, air pollution control equipment, or related facility breaks down in such a

manner as to cause the emission of air contaminants in violation of any applicable law, the source shall immediately notify the Ohio EPA district office or delegate agency of such failure or breakdown.

29.    In accordance with Section 110(a)(2) of the Act, the Ohio SIP, at times relevant to this Complaint, has included provisions prohibiting the installation of a new source of air pollutants or the modification of an air containment source without first obtaining a Permit To Install.  OAC Chapter 3745-31-02(A).

Prevention of Significant Deterioration

30.    Part C of Title I of the Act, 42 U.S.C. §§7470-7492, sets forth requirements for the prevention of significant deterioration ("PSD") of air quality in those areas designated as either attainment or unclassifiable for purposes of meeting the NAAQS.  These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process. These provisions are referred to collectively as the "PSD program."

31.    Pursuant to Section 110 of the Act, 42 U.S.C. § 7410, each State must adopt and submit to U.S. EPA for approval a SIP that includes, among other things, regulations to prevent the significant deterioration of air quality under Sections 161-165 of the Act, 42 U.S.C. §§ 7471-7475.

32.    A State may comply with Section 161 of the Act, 42 U.S.C. § 7471, by having its own PSD regulations approved by U.S. EPA as part of its SIP, which must be at least as stringent as those set forth at 40 C.F.R. § 51.166.  If a state does not have a PSD program that has been

approved by U.S. EPA and incorporated into the SIP, then the federal PSD regulations set forth at 40 C.F.R. § 52.21 may be incorporated by reference into the SIP.  40 C.F.R. § 52.21(a).

*Illinois PSD Regulations*

33.     On August 7, 1980, U.S. EPA determined that the Illinois SIP did not meet the requirements of Section 161 of the Act, 42 U.S.C. § 7471, and incorporated the federal PSD regulations at 40 C.F.R. § 52.21(b) through (w) into the Illinois SIP.  40 C.F.R. § 52.738; 45 Fed. Reg. 52676 (August 8, 1980), as amended at 46 Fed. Reg. 9584.  The regulations appearing at 40 C.F.R. § 52.21 were incorporated into and part of the Illinois SIP at the time of the violations alleged in this Complaint.  All citations to the Illinois PSD regulations herein refer to the provisions of 40 C.F.R. § 52.21 incorporated into and part of the Illinois SIP as applicable at the time of the alleged violations.  U.S. EPA has delegated to Illinois the authority to implement the federal PSD program incorporated into the Illinois SIP.  46 Fed. Reg. 9580.

*Ohio PSD Regulations*

34.     U.S. EPA conditionally approved Ohio's SIP containing its PSD program on June 29 and October 10, 2001, 66 Fed. Reg. 34596 and 66 Fed. Reg. 51570, respectively, and on January 22, 2003, EPA fully approved Ohio's PSD rules, codified at OAC 3745-31-10 through 3745-31-20, which are federally enforceable.  66 Fed. Reg. 2909.

35.     U.S. EPA approved OAC 3745-31, Ohio's "Permit to Install" regulations, as part of the federally enforceable Ohio SIP on October 31, 1980.  45 Fed. Reg. 72119.  This approval included OAC Rule 3745-31-02.  On September 8, 1993, U.S. EPA approved revisions to OAC 3745-31 as part of the federally enforceable SIP.  58 Fed. Reg. 47211.

36.     On October 1, 1982, the Administrator of U.S EPA approved OAC Rule 3745-15 as part of the federally enforceable SIP for the State of Ohio.  47 Fed. Reg. 43377.  OAC Rule

3745-15 regulates general provisions, including but not limited to malfunctions at stationary

sources, scheduled maintenance, and reporting.

NESHAPs

37.     Under Section 112(b) of the CAA, 42 U.S.C. § 7412(b), Congress established a

list of 188 hazardous air pollutants ("HAPs") believed to cause adverse health or environmental

effects.  Under Section 112(b)(2) of the Act, 42 U.S.C. § 7412(b)(2), EPA periodically reviews

the list of hazardous air pollutants and, where appropriate, revises the list by rule.

38.     Section 112(c) of the Act, 42 U.S.C. § 7412(c), requires the U.S. EPA

Administrator to publish a list of all categories and subcategories of major sources and certain

area sources of the hazardous air pollutants listed pursuant to 42 U.S.C. § 7412(b).

39.     Section 112(d) of the Act, 42 U.S.C. § 7412(d), requires the EPA Administrator to

promulgate regulations establishing emission standards for each category and subcategory of

major sources and area sources of HAPs.  These emission standards are called the National

Emission Standards for Hazardous Air Pollutants ("NESHAPs").  Numerous "source categories"

are regulated under the NESHAPs, including coke oven batteries (40 C.F.R. Part 63, Subparts L

and CCCCC).

40.     The NESHAPs apply to specific categories of stationary sources that emit HAPs,

40 C.F.R. § 63.1, including "major sources," which are sources or groups of stationary sources

located within a contiguous area and under common control that emit or have the potential to

emit ten tons per year or more of any HAP, or twenty-five tons per year or more of any

combination of HAPs.  42 U.S.C. § 7412(a)(1); 40 C.F.R. § 63.2.  An "area source" is any

stationary source of HAPs that is not a major source.  42 U.S.C. § 7412(a)(2); 40 C.F.R. § 63.2.

A "stationary source" is any building, structure, facility, or installation that emits or may emit

- 10 -

any air pollutant.  42 U.S.C. § 7412(a)(3) (by reference to 42 U.S.C. § 7411(a)(3)); 40 C.F.R. § 63.2.

41.     Sections 113(a)(3) and (b) of the Act, 42 U.S.C. §§ 7413(a)(3) and (b), prohibit violations of any NESHAP regulation.  Thus, a violation of a NESHAP regulation is a violation of the Act.

### NESHAPs for Coke Plants

42.     Pursuant to Section 112(d) of the Act, on October 27, 1993 and April 14, 2003, U.S. EPA promulgated the National Emissions Standards for Hazardous Air Pollutants (NESHAP) for Coke Oven Batteries (Subpart L) and Coke Ovens: Pushing, Quenching, and Battery Stacks (Subpart CCCCC), at 40 C.F.R. § 63.300 *et seq.,* and 40 C.F.R. § 63.7280 *et seq.* 58 Fed. Reg. 57911, and 68 Fed. Reg. 18025.  The Gateway and Haverhill Facilities' coke oven batteries are "affected sources," according to 40 C.F.R. § 63.300, 40 C.F.R. § 63.7281 and 40 C.F.R. § 63.7282, and therefore subject to Subpart L and Subpart CCCCC.

43.     Subpart L of the Coke Oven NESHAP defines "malfunctions" as any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner which causes, or has the potential to cause, the emission limitations in an applicable standard to be exceeded.  40 C.F.R. § 63.301.

44.     Subpart CCCCC of the Coke Oven NESHAP at 40 C.F.R. § 63.7336 provides that, consistent with 40 C.F.R. §§ 63.6(e) and 63.7(e)(1), deviations that occur during a period of startup, shutdown, or malfunction are not violations if responsible parties demonstrate to the Administrator's satisfaction that they were operating in accordance with 40 C.F.R. § 63.6(e)(1).

45.     Deviations caused in part by poor maintenance or careless operations are not malfunctions.  The Administrator will determine whether deviations that occur during a period of

startup, shutdown, or malfunction are violations, according to the provisions in 40 C.F.R §

63.6(e).  The NESHAP, at 40 C.F.R. § 63.6(e)(1)(i), requires that at all times, including periods

of startup, shutdown, and malfunction, the owner or operator must operate and maintain any

affected source, including associated air pollution control equipment and monitoring equipment,

in a manner consistent with safety and good air pollution control practices for minimizing

emissions.

46.     40 C.F.R. § 63.8(c)(4) provides that with the exception of system breakdowns,

repairs, calibration checks, and zero and span adjustments required, all continuous monitoring

systems shall be in continuous operation and shall meet minimum frequency of operation

requirements.

## ENFORCEMENT PROVISIONS

47.     Sections 113(a)(1) and (3) of the Act, 42 U.S.C. §§ 7413(a)(1) and (3), provide

that the Administrator may bring a civil action in accordance with CAA Section 113(b)

whenever, on the basis of any information available, the Administrator finds any person has

violated or is in violation of any other requirement or prohibition of, among other things: (1) the

PSD requirements of CAA Section 165(a), 42 U.S.C. § 7475(a); (2) the NESHAP requirements

of the CAA, Section 112, 42 U.S.C.§ 7412; (3) the federally enforceable provisions of the

Illinois SIP or any permit issued thereunder; and (4) the federally enforceable provisions of the

Ohio SIP or any permit issued thereunder.

48.     Section 304(a)(1) of the Act, 42 U.S.C. §7604(a)(1), authorizes the States of

Illinois and Ohio to commence a civil action against any person who is alleged to have violated

an emission standard or limitation under the Act.

49.     Sections 42(d) and (e) of the Illinois Act authorize the State of Illinois to commence a civil action, including for an injunction, against any person who is alleged to have violated the Illinois Act, any rule or regulation adopted under the Act, or any permit or term or condition of a permit.  415 ILCS 5/42(d) and (e).  Section 42(a) of the Illinois Act authorizes a civil penalty of up to $50,000 for each violation of the Illinois Act and implementing regulations, and up to an additional $10,000 for each day that such violations continue.

50.     Section 3704.06 of the Ohio Revised Code authorizes the Attorney General, at the request of the Director of Environmental Protection, to bring an action for an injunction, civil penalty, or any other appropriate proceedings against any person violating or threatening to violate section 3704.05 of the Ohio Revised Code. O.R.C. § 3704.06(B).  Section 3704.06(C) authorizes a civil penalty of up to $25,000 per day for each violation of Section 3704.05.

## DEFENDANTS' COKE OVENS AND EMISSIONS SOURCES

51.     The Gateway and Haverhill Facilities manufacture metallurgical coke – a low volatile carbonaceous material produced by destructive distillation (coking) of various blends of bituminous coal in banks (or batteries) of high temperature ovens (coke ovens), heated to approximately 1000º C.  Each coke oven battery at the Gateway and Haverhill Facilities operates continuously throughout the year for a total of 8760 hours, and each Facility operates its own main stack, where waste gases are exhausted subsequent to heat transfer at a heat recovery steam generator ("HRSG"), and bypass stacks, where waste gases are exhausted without heat transfer at a HRSG.  At the Haverhill Facility and in the Haverhill Permit, the main stack is termed the "Waste Gas Stack," and the bypass vents are termed the "Bypass Vent Stacks."  At the Gateway Facility and in the Gateway Permit, the main stack is termed the "Main Stack," and the bypass vents are termed the "Waste Heat Stacks."

52.     The Gateway Facility consists of 120 heat recovery coke ovens arranged in three batteries, each with 40 ovens.  Each oven connects to the Facility's common tunnel.  The common tunnel collects gas from all ovens to serve six HRSGs and six associated waste heat stacks.

53.     The Haverhill Facility consists of 200 heat recovery coke ovens designated as Batteries A, B, C, and D.  Batteries A and B at the Haverhill Facility, constructed in 2004, are identified as emission unit P901.  Batteries C and D at the Haverhill Facility, constructed in 2008, are identified as emission unit P902.

54.     The Gateway and Haverhill Facilities emit HAPs and other pollutants, including $SO_2$, PM, $NO_x$, volatile organic matter, carbon monoxide ("CO"), mercury, HCl, and lead.

55.     Coke oven emissions produced during the coking process are a known human carcinogen.  Chronic (long-term) exposure to coke oven emissions in humans results in conjunctivitis, severe dermatitis, and lesions of the respiratory system and digestive system.

56.     $SO_2$ contributes to acid rain and exacerbates respiratory illness, particularly in children and the elderly.  $SO_2$ also contributes to the formation of particulate matter by reacting with other chemicals in the air to form tiny sulfate particles.  Particulate matter can travel through the air in varying sizes and become embedded in human lungs, and once embedded can also travel to the bloodstream.  Exposure to particulate pollution has been linked to, *inter alia*, decreased lung function, aggravated asthma, and premature death in people with heart or lung disease.

## PERMITS

57.     The Illinois EPA, through its delegated permit authority, issued PSD Construction Permit No. 06070020 ("the Gateway Permit") to Gateway Energy & Coke on March 13, 2008. A revised permit, also referred to as "the Gateway Permit" when applicable, was issued on April 28, 2010.

58.     The Ohio EPA, pursuant to 40 C.F.R. §§ 52.21 and 52.1884, issued Permit to Install No. 07-00511 ("Haverhill Permit") to Haverhill Coke Company with an effective date of December 11, 2003.  Ohio EPA issued the Haverhill Permit to the Haverhill Facility pursuant to the Permit to Install ("PTI") program incorporated into the Ohio SIP.  Modifications to the Haverhill Permit, also referred to as "the Haverhill Permit" when applicable, have been issued, including on June 11, 2006, June 27, 2006, January 15, 2008, November 10, 2008 and December 26, 2008.

59.     The Gateway Permit contains emissions limits and operational standards for various emissions units at the Gateway Facility, including one main stack and six individual waste heat stacks.

60.     The Haverhill Permit contains emissions limits and operational standards for various emissions units at the Haverhill Facility, including P901 and P902.

61.     P901 has five bypass vent stacks (VS1-VS5) that are subject to emission limits set forth in the Haverhill Permit.  P902 has five bypass vent stacks (VS6-VS10) that are subject to emission limits set forth in the Haverhill Permit.

## GENERAL ALLEGATIONS

62.     Each Defendant is a "person" within the meaning of Section 302(e) of the CAA, 42 U.S.C. § 7602(e).  HNCC and SunCoke are each a "person" within the meaning of O.R.C. §

3704.01(O), Ohio Administrative Code ("OAC") 3745-15-01(V).  GECC and SunCoke are each a "person" with the meaning of Section 3.315 of the Illinois Act and 35 Ill. Adm. Code § 201.102.

63.     Each Defendant is an "owner or operator," within the meaning of Section 112(a)(9) of the CAA, 42 U.S.C. § 7412(a)(9) and the Ohio or Illinois SIP, as applicable, of the facility or facilities in question.  The Gateway Defendants are owners and operators of the Gateway Facility within the meaning of  35 Ill. Adm. Code § 201.102.  The Haverhill Defendants are owners and operators of the Haverhill Facility within the meaning of OAC 3745-15-01(T).

64.     The Facilities are "stationary sources" within the meaning of Section 112(a)(3) of the CAA, 42 U.S.C. § 7412(a)(3).  At all times relevant hereto, the Facilities have operated, and continue to operate, several "stationary sources" of air emissions that are subject to one or more NESHAPs found at 40 C.F.R. Part 63.

65.     The Gateway Facility and the Haverhill Facility are both "major source[s]" as defined at Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1).

66.     The Gateway Facility and the Haverhill Facility are both "major emitting facilities," as defined in Section 169(1) of the Act, 42 U.S.C. § 7479(1).

67.     On multiple occasions from 2004 through 2012, the Director of Ohio EPA authorized scheduled maintenance on the control equipment at the Haverhill Facility, pursuant to OAC 3745-15-06.  Ohio jointly asserts the Sixth through Sixteenth Claims to the extent that it has not already addressed such claims, and the events giving rise to these claims, through Director's letters.

### CLAIMS AGAINST DEFENDANTS GATEWAY ENERGY & COKE COMPANY, LLC AND SUNCOKE ENERGY, INC.

### FIRST CLAIM FOR RELIEF
Excess Bypass Venting
Asserted by the United States and the State of Illinois

68.     Paragraphs 1 through 67 are re-alleged and incorporated herein.

69.     The Gateway Facility Permit condition 4.1.5(a)(i)(D)(1) limits the total duration of venting through all of its waste heat stacks combined, with coking gases not controlled by the spray dryer/fabric filter system, to 1872 stack hours within any 12-month rolling period.

70.     The Gateway Facility Permit condition 4.1.5(a)(i)(D)(1) limits bypass venting from each waste heat stack to 192 hours per stack within any 12-month rolling period.

71.      During one or more rolling 12-month periods beginning on or about December 28, 2009, the Gateway Facility failed to limit total bypass venting from one or more of its individual waste heat stacks to 1872 stack hours on a rolling 12-month basis, in violation of the Gateway Facility Permit condition 4.1.5(a)(i)(D), Section 9.1(d) of the Illinois Act, 415 ILCS 5/9.1(d), and federal NESHAP regulations at 40 C.F.R. § 63.6(e)(1).

72.     During one or more rolling 12-month periods beginning on or about December 28, 2009, the Gateway Facility failed to limit bypass venting from one or more individual waste heat stack to 192 venting hours per stack per rolling 12-month period in violation of the Gateway Facility Permit condition 4.1.5(a)(i)(D)(1), Section 9.1(d) of the Illinois Act, 415 ILCS 5/9.1(d), federal PSD regulations at 40 C.F.R. § 52.23, and federal NESHAP regulations at 40 C.F.R. § 63.6(e)(1).

73.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth in Paragraphs 71-72 subject the Gateway Defendants to injunctive relief and civil penalties of up to $37,500 per day for each such violation occurring on or after January 12, 2009, pursuant

to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

74.    As provided in Sections 42(a) and (e) of the Illinois Act, 415 ILCS 5/42(a) and (e), the violations set forth in Paragraphs 71-72 subject the Gateway Defendants to injunctive relief and civil penalties up to $50,000 for each violation and up to an additional $10,000 for each day that the violation has continued.

### SECOND CLAIM FOR RELIEF
Excess PM Emissions Due to Bypass Venting
Asserted by the United States and the State of Illinois

75.    Paragraphs 1 through 67 are re-alleged and incorporated herein.

76.    The Gateway Facility Permit condition 4.1.6(b)(iv) limits PM emissions from all waste heat stacks combined to 30.24 tons on a rolling 12-month basis for all waste heat stacks combined.

77.     During one or more rolling 12-month periods, beginning on or about December 28, 2009, the Gateway Facility vented more than 30.24 tons of PM emissions per year on a rolling 12-month basis from one or more of its individual waste heat stacks in violation of Gateway Facility Permit condition 4.1.6(b)(iv), Section 9.1(d) of the Illinois Act, 415 ILCS 5/9.1(d), federal PSD regulations at 40 C.F.R. § 52.23, and federal NESHAP regulations at 40 C.F.R. § 63.6(e)(1).

78.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth in Paragraph 77 subject the Gateway Defendants to injunctive relief and civil penalties of up to $37,500 per day for each such violation occurring on or after January 12, 2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

79.    As provided in Sections 42(a) and (e) of the Illinois Act, 415 ILCS 5/42(a) and (e), the violations set forth in Paragraph 77 subject the Gateway Defendants to injunctive relief and civil penalties up to $50,000 for each violation and up to an additional $10,000 for each day that the violation has continued.

### THIRD CLAIM FOR RELIEF
Excess $SO_2$ Emissions Due to Bypass Venting
Asserted by the United States and the State of Illinois

80.    Paragraphs 1 through 67 are re-alleged and incorporated herein.

81.    The Gateway Facility Permit condition 4.1.6(b)(iv) limits $SO_2$ emissions from all waste heat stacks combined to 355.21 tons per year on a rolling 12-month basis for all waste heat stacks combined.

82.    During one or more rolling 12-month periods, beginning on or about December 28, 2009, the Gateway Facility vented more than 355.21 tons of $SO_2$ emissions per year on a rolling 12-month basis from one or more of its waste heat stacks in violation of Gateway Facility Permit condition 4.1.6(b)(iv), Section 9.1(d) of the Illinois Act, 415 ILCS 5/9.1(d), federal PSD regulations at 40 C.F.R. § 52.23, and federal NESHAP regulations at 40 C.F.R. § 63.6(e)(1).

83.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth in Paragraph 82 subject the Gateway Defendants to injunctive relief and civil penalties of up to $37,500 per day for each such violation occurring on or after January 12, 2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

84.     As provided in Sections 42(a) and (e) of the Illinois Act, 415 ILCS 5/42(a) and (e), the violations set forth in Paragraph 82 subject the Gateway Defendants to injunctive relief

and civil penalties up to $50,000 for each violation and up to an additional $10,000 for each day that the violation has continued.

## FOURTH CLAIM FOR RELIEF
### Excess Lead Emissions
### Asserted by the United States and the State of Illinois

85.    Paragraphs 1 through 67 are re-alleged and incorporated herein.

86.    The Gateway Facility Permit condition 4.1.6(b)(iv) limits lead emissions from each individual waste heat stack to 0.065 pounds per hour.

87.    On one or more occasions, and based on performance testing conducted at the Gateway Facility in May 2010, lead emissions vented from waste heat stack #6 were at least 0.086 pounds per hour in violation of Gateway Facility Permit condition 4.1.6(b)(iv), Section 9.1(d) of the Illinois Act, 415 ILCS 5/9.1(d), and federal NESHAP regulations at 40 C.F.R. § 63.6(e)(1).

88.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth in Paragraph 87 subject the Gateway Defendants to injunctive relief and civil penalties of up to $37,500 per day for each such violation occurring on or after January 12, 2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

89.    As provided in Sections 42(a) and (e) of the Illinois Act, 415 ILCS 5/42(a) and (e), the violations set forth in Paragraph 87 subject the Gateway Defendants to injunctive relief and civil penalties up to $50,000 for each violation and up to an additional $10,000 for each day that the violation has continued.

## FIFTH CLAIM FOR RELIEF
Improper Venting During Main Stack Replacement
Asserted by the United States and the State of Illinois

90.　　Paragraphs 1 through 67 are re-alleged and incorporated herein.

91.　　The Gateway Facility Permit condition 4.1.5(a)(i)(D)(1) prohibits use of more than one waste heat stack at any time.

92.　　In approximately October 2011, the Gateway Defendants replaced the main stack at the Gateway Facility.  The Gateway Defendants continued to operate the Gateway Facility during this main stack replacement, which has now been completed, in a manner that resulted in venting through more than one waste heat stack at one time.

93.　　The excess venting set forth in Paragraph 92 resulted in violations of the Gateway Facility Permit conditions 4.1.5(a)(i)(D)(1), Section 9.1(d) of the Illinois Act, 415 ILCS 5/9.1(d), federal PSD regulations at 40 C.F.R. § 52.23, and federal NESHAP regulations at 40 C.F.R. § 63.6(e).

94.　　As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth in Paragraph 92 subject the Gateway Defendants to civil penalties of up to $37,500 per day for each such violation occurring on or after January 12, 2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

95.　　As provided in Sections 42(a) and (e) of the Illinois Act, 415 ILCS 5/42(a) and (e), the violations set forth in Paragraph 92 subject the Gateway Defendants to injunctive relief and civil penalties up to $50,000 for each violation and up to an additional $10,000 for each day that the violation has continued.

## CLAIMS AGAINST DEFENDANTS HAVERHILL COKE COMPANY, LLC AND SUNCOKE ENERGY, INC.

### SIXTH CLAIM FOR RELIEF
Excessive Bypass Venting
Asserted by the United States and the State of Ohio

96.     Paragraphs 1 through 67 are re-alleged and incorporated herein.

97.     The Haverhill Permit Parts C(7)(c)(9) and C(8)(c)(15) limit bypass venting from units P901 and P902 bypass vent stacks to 192 hours per year, per bypass vent stack, on a rolling 12-month basis.

98.     During one or more rolling 12-month periods, beginning on or about March 30, 2005, the Haverhill Facility failed to limit bypass venting to 192 hours per year, per bypass vent stack, on a rolling 12-month basis.

99.     The Haverhill Defendants' failures to limit bypass venting as required by the terms of the Haverhill permit as set forth in Paragraph 98 constitute violations of the Haverhill Permit, Section 3704.05 of the ORC, Ohio SIP PSD regulations, and federal NESHAP regulations at 40 C.F.R. § 63.6(e).

100.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth in Paragraph 98 subject the Haverhill Defendants to injunctive relief and civil penalties of up to $32,500 per day for each such violation occurring on or after March 15, 2004; and $37,500 per day for each such violation occurring on or after January 12, 2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

101.    As provided in Section 3704.06(C) of the ORC, the violations set forth in Paragraph 98 subject to Haverhill Defendants to injunctive relief and a civil penalty of up to $25,000 per day for each violation of Section 3704.05.

- 22 -

**SEVENTH CLAIM FOR RELIEF**
Excess $SO_2$ Emissions Due to Bypass Venting
Asserted by the United States and the State of Ohio

102.    Paragraphs 1 through 67 are re-alleged and incorporated herein.

103.    The Haverhill Permit conditions at Parts C(7)(b)(1)(b) and C(8)(b)(1)(b) limit $SO_2$ emissions vented from all bypass vent stacks at unit P901 and unit P902 to 192 tons per year per unit on a rolling 12-month basis.

104.    According to reports provided by the Haverhill Facility, during one or more rolling 12-month periods beginning on or about January 1, 2007, emissions vented from all one or more P901 bypass vent stacks at the Haverhill Facility exceeded the $SO_2$ emissions allowed on a rolling 12-month basis pursuant to Part C(7)(b)(1)(b) of the Haverhill Permit.  According to reports provided by the Haverhill Facility, during one or more rolling 12-month periods in at least 2009, emissions vented from one or more of the P902 bypass vent stacks at the Haverhill Facility exceeded the $SO_2$ emissions allowed on a rolling 12-month basis pursuant to Part C(8)(b)(1)(b) of the Haverhill Permit.

105.    The Haverhill Defendants' failures to maintain $SO_2$ emissions at or below 192 tons per year per unit on a rolling 12-month basis at the P901 and P902 bypass vents, as set forth in Paragraph 104, constitute violations of the Haverhill Permit, Section 3704.05 of the ORC, the Ohio SIP PSD regulations, and federal NESHAP regulations at 40 C.F.R § 63.6(e).

106.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth in Paragraph 104 subject the Haverhill Defendants to injunctive relief and civil penalties of up to $32,500 per day for each such violation occurring on or after March 15, 2004; and $37,500 per day for each such violation occurring on or after January 12, 2009, pursuant to the Federal

Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

107.    As provided in Section 3704.06(C) of the ORC, the violations set forth in Paragraph 104 subject to Haverhill Defendants to injunctive relief and a civil penalty of up to $25,000 per day for each violation of Section 3704.05.

## EIGHTH CLAIM FOR RELIEF
Excess PM Emissions Due to Bypass Venting
Asserted by the United States and the State of Ohio

108.    Paragraphs 1 through 67 are re-alleged and incorporated herein.

109.    The Haverhill Permit conditions at Parts C(7)(b)(1)(b) and C(8)(b)(1)(b) limit filterable PM emissions vented from all P901 bypass vent stacks combined to 10.8 tons per year on a rolling 12-month basis, and annual filterable and condensable PM emissions vented from all P902 bypass vent stacks combined to 17.07 tons per year on a rolling 12-month basis.

110.    During one or more rolling 12-month periods beginning on or about March 30, 2005, according to reports provided by the Haverhill Facility, the Haverhill Facility vented PM emissions from one or more of the P901 and from one or more of the P902 bypass vent stacks in a manner exceeding allowable filterable PM emission limits at P901 on a rolling 12-month basis and exceeding allowable filterable and condensable PM emission limits on a rolling 12-month basis at P902.

111.    The Haverhill Defendants' failures to maintain PM emissions at or below 10.8 tons per year on a rolling 12-month basis at P901 and at or below 17.07 tons per year on a rolling 12-month basis at P902 as set forth in Paragraph 110 constitute violations of the Haverhill Permit, Section 3704.05 of the ORC, the Ohio SIP PSD regulations, and federal NESHAP regulations at 40 C.F.R § 63.6(e).

112.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth in Paragraph 110 subject the Haverhill Defendants to injunctive relief and civil penalties of up to $32,500 per day for each such violation occurring on or after March 15, 2004; and $37,500 per day for each such violation occurring on or after January 12, 2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

113.     As provided in Section 3704.06(C) of the ORC, the violations set forth in Paragraph 110 subject to Haverhill Defendants to injunctive relief and a civil penalty of up to $25,000 per day for each violation of Section 3704.05.

### NINTH CLAIM FOR RELIEF
Excess $SO_2$ Emissions from P901 Waste Gas Stack
Asserted by the United States and the State of Ohio

114.     Paragraphs 1 through 67 are re-alleged and incorporated herein.

115.     The Haverhill Permit conditions at Parts C(7)(b)(1)(b) and C(8)(b)(1)(b) limit $SO_2$ emissions from the unit P901 waste gas stack to 192 lbs/hr as a 3-hour block average and 700.80 tons per year on a rolling 12-month basis.

116.     According to reports provided by the Haverhill Facility, during one or more rolling 12-month periods since June 30, 2005 at P901, emissions vented from the P901 waste gas stack at the Haverhill Facility exceeded the $SO_2$ emission limits allowed pursuant to Parts C(7)(b)(1)(b) and C(8)(b)(1)(b)of the Haverhill Permit as set forth in Paragraph 115.

117.     The Haverhill Defendants' failures to maintain $SO_2$ emissions at or below 192 lbs/hr as a 3-hour block average and 700.80 tons per year on a rolling 12-month basis constitute violations of the Haverhill Permit, Section 3705.05 of the ORC, the Ohio SIP PSD regulations, and federal NESHAP regulations at 40 C.F.R § 63.6(e).

118.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth in Paragraph 116 subject the Haverhill Defendants to injunctive relief and civil penalties of up to $32,500 per day for each such violation occurring on or after March 15, 2004; and $37,500 per day for each such violation occurring on or after January 12, 2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

119.     As provided in Section 3704.06(C) of the ORC, the violations set forth in Paragraph 116 subject to Haverhill Defendants to injunctive relief and a civil penalty of up to $25,000 per day for each violation of Section 3704.05.

**TENTH CLAIM FOR RELIEF**
Simultaneous Operation of More than One Bypass Vent Stack
Asserted by the United States

120.     Paragraphs 1 through 67 are re-alleged and incorporated herein.

121.     The Haverhill Permit Parts C(7)(c)(9) and C(8)(c)(15) require that the Haverhill Facility operate not more than one HRSG bypass vent stack at any one time.

122.     On one or more occasions beginning on or about March 30, 2005, the Haverhill Defendants have operated more than one bypass vent stack simultaneously at the Haverhill Facility, in violation of Haverhill Permit Parts C(7)(c)(9) and C(8)(c)(15), the Ohio SIP PSD regulations, and the federal NESHAP regulations at 40 C.F.R. § 63.6(e).

123.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth in Paragraph 122 subject the Haverhill Defendants to injunctive relief and civil penalties of up to $32,500 per day for each such violation occurring on or after March 15, 2004; and $37,500 per day for each such violation occurring on or after January 12, 2009, pursuant to the Federal

Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

## ELEVENTH CLAIM FOR RELIEF
Violation of $NO_x$ Emission Limit at P902 Waste Gas Stack
Asserted by the United States and the State of Ohio

124.    Paragraphs 1 through 67 are re-alleged and incorporated herein.

125.    The Haverhill Permit Part C(8)(b)(1)(b) limits $NO_x$ emissions from the P902 waste gas stack to no more than 120 pounds per hour and no more than 1 pound per ton of coal charge.

126.    Based on an April 9, 2009 Compliance Demonstration Report submitted by the Haverhill Defendants, on one or more occasions from at least April 9, 2009 until July 9, 2009, $NO_x$ emissions vented from the P902 waste gas stack at the Haverhill Facility exceeded the 1 pound per ton of coal charge limit, in violation of Haverhill Permit Part C(8)(b)(1)(b) and Section 3704.05 of the ORC, Ohio SIP PSD regulations, and the federal NESHAP regulations at 40 C.F.R. § 63.6(e).

127.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth in Paragraph 126 subject the Haverhill Defendants to injunctive relief and civil penalties of up to $37,500 per day for each such violation occurring on or after January 12, 2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

128.    As provided in Section 3704.06(C) of the ORC, the violations set forth in Paragraph 126 subject Haverhill Defendants to injunctive relief and a civil penalty of up to $25,000 per day for each violation of Section 3704.05.

**TWELFTH CLAIM FOR RELIEF**
Excess CEMs Downtime
Asserted by the United States and the State of Ohio

129.    Paragraphs 1 through 67 are re-alleged and incorporated herein.

130.    Pursuant to the Haverhill Permit requirements at Part C(7)(d)(7) and Part

C(8)(d)(7)and NESHAP requirements at 40 C.F.R. § 63.8(c)(4), the Haverhill Defendants are

required to operate and maintain emission monitoring equipment (specifically the Continuous

Emission Monitors or CEMs) continuously to monitor and record $SO_2$ emissions from the P901

and P902 waste gas stacks in pounds per hour, and maintain records of all data obtained by the

continuous $SO_2$ monitoring system including, but not limited to, parts per million $SO_2$ on a 1-

hour basis, results of daily zero/span calibration checks, and magnitude of manual calibration

adjustments.

131.    On one or more occasions since June 30, 2005 at P901 and since October 15,

2008 at P902, the Haverhill Defendants failed to operate emission monitoring systems

consistently or in continuous operation.  The Haverhill Defendants' failures to continuously

operate and maintain CEMs to monitor $SO_2$ emissions from the waste gas stacks at the Haverhill

Facility are violations of the Haverhill Facility's PSD permit, Section 3704.05 of the ORC, Ohio

SIP PSD regulations, and federal NESHAP regulations at 40 C.F.R. § 63.6(e) and 40 C.F.R. §

63.8(c)(4).

132.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set

forth in Paragraph 131 subject the Haverhill Defendants to injunctive relief and civil penalties of

up to $32,500 per day for each such violation occurring on or after March 15, 2004; and $37,500

per day for each such violation occurring on or after January 12, 2009, pursuant to the Federal

Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

133.    As provided in Section 3704.06(C) of the ORC, the violations set forth in Paragraph 131 subject to Haverhill Defendants to injunctive relief and a civil penalty of up to $25,000 per day for each violation of Section 3704.05.

### THIRTEENTH CLAIM FOR RELIEF
Excess $SO_2$ CEMS and Mercury Monitoring System Downtime
Asserted by the United States and the State of Ohio

134.    Paragraphs 1 through 67 are re-alleged and incorporated herein.

135.    The Haverhill Permit requirements at Parts C(7)(d)(7), C(8)(d)(7) and C(8)(d)(40-41), as well as the federal NESHAP requirements found at 40 C.F.R. § 63.8(c)(4), require the Haverhill Facility to operate and maintain emission monitoring equipment continuously to monitor and record $SO_2$ emissions from the P901 waste gas stack and $SO_2$ and mercury emissions from the P902 waste gas stack at the Haverhill Facility in pounds per hour, and maintain records of data obtained by the CEMs and sorbent trap monitoring system, including the concentration and emission rate of $SO_2$ and mercury from the exhausted gas where applicable.

136.     On one or more occasions beginning on or about June 30, 2005 at P901 and beginning on or about October 15, 2008 at P902, the Haverhill Facility failed to continuously operate and maintain its SO2 CEMS equipment.  Failures to maintain and continuously operate such monitoring equipment are violations of the Haverhill Permit, Section 3704.05 of the ORC, Ohio SIP PSD regulations, federal NESHAP regulations at 40 C.F.R. § 63.6(e), and 40 C.F.R. § 63.8(c)(4).

137.    On one or more occasions on or about September 5, 2008, the Haverhill Facility failed to continuously operate and maintain its sorbent trap monitoring system at P902.  Failures

to maintain and continuously operate such monitoring equipment are violations of the Haverhill

Permit, Section 3704.05 of the ORC, Ohio SIP PSD regulations, and federal NESHAP

regulations at 40 C.F.R. § 63.6(e) and 40 C.F.R. § 63.8(c)(4).

138.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set

forth in Paragraphs 136-137 subject the Haverhill Defendants to injunctive relief and civil

penalties of up to $32,500 per day for each such violation occurring on or after March 15, 2004;

and $37,500 per day for each such violation occurring on or after January 12, 2009, pursuant to

the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by

31 U.S.C. § 3701.

139.    As provided in Section 3704.06(C) of the ORC, the violations set forth in

Paragraphs 136-137 subject to Haverhill Defendants to injunctive relief and a civil penalty of up

to $25,000 per day for each violation of Section 3704.05.

**FOURTEENTH CLAIM FOR RELIEF**
Failure to Limit Daily Coal Charges
Asserted by the United States and the State of Ohio

140.    Paragraphs 1 through 67 are re-alleged and incorporated herein.

141.    The Haverhill Permit Part C(7)(c)(5) requires that the maximum daily wet coal

usage rate at unit P901 shall not exceed 2,400 wet tons of coal.  Part C(8)(c)(5) requires that the

maximum daily wet coal usage rate for unit P902 shall not exceed 2,400 wet tons of coal.

142.    On one or more occasions since January 14, 2007 for P901 and since December

24, 2008 for P902, the Haverhill Defendants have exceeded the daily permitted coal charge

limits at units P901 and/or P902.

143.    The Haverhill Defendants' failures to limit daily coal charges to the applicable

limits as set forth in Paragraph 142 are violations of Parts P901 and P902 III Section A(II)(5) of

the Haverhill Permit, Section 3704.05 of the ORC, the Ohio SIP, and federal NESHAP

regulations at 40 C.F.R. § 63.6(e).

144.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set

forth in Paragraph 142 subject the Haverhill Defendants to injunctive relief and civil penalties of

up to $32,500 per day for each such violation occurring on or after March 15, 2004; and $37,500

per day for each such violation occurring on or after January 12, 2009, pursuant to the Federal

Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. §

3701.

145.    As provided in Section 3704.06(C) of the ORC, the violations set forth in

Paragraph 142 subject to Haverhill Defendants to injunctive relief and a civil penalty of up to

$25,000 per day for each violation of Section 3704.05.

**FIFTEENTH CLAIM FOR RELIEF**
Failure to Maintain Baghouse Pressure Drops
Asserted by the United States and the State of Ohio

146.    Paragraphs 1 through 67 are re-alleged and incorporated herein.

147.    The Haverhill Permit Parts C(7)(c)(1) and C(8)(c)(1) require that the pressure

drop across the waste gas exhaust baghouse for emission units P901 and P902, respectively, must

be maintained within the range of 3 to 12 inches of water while the emission unit is in operation.

Parts C(7)(c)(2) and C(8)(c)(2) require that the pressure drop across each charging baghouse for

emission units P901 and P902, respectively, must be maintained within the range of 3 to 12

inches of water while the emission unit is in operation.

148.    On one or more occasions since January 17, 2006 at P901 and since November 5,

2008 at P902, the Haverhill Defendants have failed to maintain the baghouse pressure drop as

specified in Paragraph 147.

149.     The Haverhill Defendants' failures to maintain baghouse pressure drops within

the  ranges required by the Haverhill Permit as set forth in Paragraphs 147-148 are violations of

the Haverhill Permit, Section 3704.05 of the ORC, the Ohio SIP, and federal NESHAP

regulations at 40 C.F.R. § 63.6(e).

150.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set

forth in Paragraphs 147-148 subject the Haverhill Defendants to injunctive relief and civil

penalties of up to $32,500 per day for each such violation occurring on or after March 15, 2004;

and $37,500 per day for each such violation occurring on or after January 12, 2009, pursuant to

the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by

31 U.S.C. § 3701.

151.     As provided in Section 3704.06(C) of the ORC, the violations set forth in

Paragraphs 147-148 subject to Haverhill Defendants to injunctive relief and a civil penalty of up

to $25,000 per day for each violation of Section 3704.05.

### SIXTEENTH CLAIM FOR RELIEF
Failure to Notify Portsmouth Local Air Agency of Malfunctions
Asserted by the United States and the State of Ohio

152.     Paragraphs 1 through 67 are re-alleged and incorporated herein.

153.     The Haverhill Permit and Ohio SIP regulations at OAC 3745-15-06(B)(1) require

reporting of all malfunctions at the Haverhill Facility as soon as practicable to the Portsmouth

Local Air Agency.

154.     On July 6, 2008, the Haverhill Facility experienced a coke screening baghouse

malfunction.  This malfunction was not reported to the Portsmouth Local Air Agency, in

violation of the Haverhill Permit and OAC 3745-15-06(B)(1).

155.    The failure to report  set forth in Paragraph 154 is a violation of the Haverhill Permit, Section 3704.05 of the ORC, and Ohio SIP regulations at OAC 3745-15-06(B)(1).

156.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violation set forth in Paragraph 154 subject the Haverhill Defendants to civil penalties of up to $32,500 per day for each such violation occurring on or after March 15, 2004, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

157.    As provided in Section 3704.06(C) of the ORC, the violations set forth in Paragraph 154 subject to Haverhill Defendants to injunctive relief and a civil penalty of up to $25,000 per day for each violation of Section 3704.05.

## PRAYER FOR RELIEF

WHEREFORE, based upon all the allegations set forth above, the United States, the State of Ohio, and the State of Illinois request that this Court:

1.    Permanently enjoin Defendants from further violations of the Clean Air Act, 42 U.S.C. § 7401 *et seq*., the Illinois Act, 415 ILCS 5/1 *et seq*., Chapter 3704 of the Ohio Revised Code, and their implementing permits and regulations;

2.    Order Defendants promptly to take all steps necessary or appropriate to ensure compliance with the foregoing laws, regulations and permits and to mitigate the effects of its past violations;

3.    Enter judgment assessing civil penalties against Defendants for up to the amounts provided in the CAA, the Illinois Act, and the Ohio Revised Code, for each such violation;

4.    Award Plaintiffs their costs and disbursements in this action; and

5.      Award such other relief as this Court may deem just and proper.

Respectfully Submitted,

FOR THE UNITED STATES OF AMERICA:

Date: _6/20/13_

ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

Date: _6/23/13_

CATHERINE BANERJEE ROJKO
Senior Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C.  20044-7611
Telephone: 202-514-3145

STEPHEN R. WIGGINGTON
United States Attorney

J. CHRISTOPHER MOORE
Assistant United States Attorney
United States Attorney's Office
Nine Executive Drive
Fairview Heights, IL 62208-1344
Telephone: (618) 628-3700


Of Counsel:
JAMES MORRIS
Associate Regional Counsel
JOSE C. DE LEON
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 5 (C-14J)
77 West Jackson Blvd.
Chicago, IL  60604

TERESA DYKES
Attorney-Advisor
Air Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
12th Street and Pennsylvania Avenue, N.W.
Washington, D.C.  20004

FOR THE STATE OF ILLINOIS:

**PEOPLE OF THE STATE OF ILLINOIS
ex rel. LISA MADIGAN,**
Attorney General of the
State of Illinois

MATTHEW J. DUNN, Chief
Environmental Enforcement/
Asbestos Litigation Division

Date: 6/14/13

THOMAS DAVIS
Assistant Attorney General
Environmental Enforcement Bureau, Chief
500 S. Second Street
Springfield, IL 62706

Of Counsel:
CHRISTINE ZEIVEL
Assistant Attorney General
500 S. Second Street
Springfield, Illinois 62706

FOR THE STATE OF OHIO:

MICHAEL DEWINE
Ohio Attorney General

Date: 6/17/13

ELIZABETH EWING
Assistant Attorney General
Environmental Enforcement Section
30 E. Broad St., 25th Floor
Columbus, Ohio 43215